

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | SOP Team nwsop@nationwide.com<br>Nationwide Mutual Insurance Company<br>Three Nationwide Plaza<br>Columbus, OH 43215 |
| **Electronic copy provided to:** | Ashley Roberts |

| | |
|---|---|
| **Entity:** | Scottsdale Insurance Company<br>Entity ID Number  3286058 |
| **Entity Served:** | Scottsdale Insurance Company |
| **Title of Action:** | Futs Auto Body Repair, LLC vs. Scottsdale Insurance Company and Nationwide Insurance Company |
| **Matter Name/ID:** | Futs Auto Body Repair, LLC vs. Scottsdale Insurance Company and Nationwide Insurance Company (9944019) |
| **Document(s) Type:** | Citation/Petition |
| **Nature of Action:** | Contract |
| **Court/Agency:** | Orleans Civil District Court, LA |
| **Case/Reference No:** | 2019-08672 |
| **Jurisdiction Served:** | Louisiana |
| **Date Served on CSC:** | 01/17/2020 |
| **Answer or Appearance Due:** | 15 Days |
| **Originally Served On:** | LA SOS on 01/15/2020 |
| **How Served:** | Certified Mail |
| Sender Information: | Jerome J Pellerin<br>N/A |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674  (888) 690-2882  |  sop@cscglobal.com

**State of Louisiana**
**Secretary of State**

01/16/2020

Legal Services Section
P.O. Box 94125, Baton Rouge, LA 70804-9125
(225) 922-0415

SCOTTSDALE INSURANCE COMPANY
C/O CORPORATION SERVICE COMPANY
501 LOUISIANA AVENUE
BATON ROUGE, LA  70802-5921

Suit No.: 201908672
CIVIL DISTRICT COURT
ORLEANS PARISH

FUTS AUTO BODY REPAIR, LLC
vs
SCOTTSDALE INSURANCE COMPANY, ET AL

Dear Sir/Madam:

I am enclosing a citation served in regard to the above entitled proceeding. If you are not the intended recipient of this document, please return it to the above address with a letter of explanation. All other questions regarding this document should be addressed to the attorney that filed this proceeding.

Yours very truly,

R. KYLE ARDOIN
Secretary of State

Served on:  R. KYLE ARDOIN
Served by:  E CUMMINS

Date: 01/15/2020
Title:  DEPUTY SHERIFF

**No: 1148167**



TG

ATTORNEY'S NAME:   Pellerin, Jerome J 17739
AND ADDRESS:        9024 Belfast Street , New Orleans, LA 70118-0050

# CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
## STATE OF LOUISIANA

| NO: 2019-08672 | DIVISION: F | SECTION: 07 |
|---|---|---|

### FUTS AUTO BODY REPAIR, LLC

#### Versus

### SCOTTSDALE INSURANCE COMPANY ET AL

### CITATION

TO:   SCOTTSDALE INSURANCE COMPANY

THROUGH:   THE LOUISIANA SECRETARY OF STATE

8535 ARCHIVES DRIVE, BATON ROUGE, LA 70809

**SERVED ON**
**R. KYLE ARDOIN**

**JAN 1 5 2020**

SECRETARY OF STATE
COMMERCIAL DIVISION

**YOU HAVE BEEN SUED:**

You must either comply with the demand contained in the

PETITION FOR DAMAGES, BREACH OF DUTY AND CONTRACT

a certified copy of which accompanies this citation, or file an answer or other legal pleading in the office of the Clerk of this Court, Room 402, Civil Courts Building, 421 Loyola Avenue, New Orleans, LA, within fifteen (15) days after the service hereof under penalty of default.

### ADDITIONAL INFORMATION

Legal assistance is advisable. If you want a lawyer and can't find one, you may call the New Orleans Lawyer Referral Service at 504-561-8828. This Referral Service operates in conjunction with the New Orleans Bar Association. If you qualify, you may be entitled to free legal assistance through Southeast Louisiana Legal Services (SLLS) at 877-521-6242 or 504-529-1000.

**\*\*\*\*\*\*\*\*COURT PERSONNEL ARE NOT PERMITTED TO GIVE LEGAL ADVICE\*\*\*\*\*\*\*\***

**IN WITNESS HEREOF, I have hereunto set my hand and affix the seal of the Civil District Court for the Parish of Orleans, State of LA December 12, 2019**

**Clerk's Office, Room 402, Civil Courts**
**421 Loyola Avenue**
**New Orleans, LA**

**CHELSEY RICHARD NAPOLEON, Clerk of**
**The Civil District Court**
**for the Parish of Orleans**
**State of LA**
**by** _____
**Cederick Favaroth, Deputy Clerk**

---

### SHERIFF'S RETURN
(for use of process servers only)

| PERSONAL SERVICE | DOMICILIARY SERVICE |
|---|---|
| On this _____ day of _____ _____ served a copy of the within | On this _____ day of _____ _____ served a copy of the within |
| **PETITION FOR DAMAGES, BREACH OF DUTY AND CONTRACT** | **PETITION FOR DAMAGES, BREACH OF DUTY AND CONTRACT** |
| ON  **SCOTTSDALE INSURANCE COMPANY** | ON  **SCOTTSDALE INSURANCE COMPANY** |
| THROUGH:  **THE LOUISIANA SECRETARY OF STATE** | THROUGH:  **THE LOUISIANA SECRETARY OF STATE** |
| Returned the same day | by leaving same at the dwelling house, or usual place of abode, in the hands of |
| _____ No. _____ | _____ a person of suitable age and discretion residing therein as a member of the domiciliary establishment, whose |
| Deputy Sheriff of _____ | name and other facts connected with this service I learned by interrogating HIM/HER the said **SCOTTSDALE INSURANCE COMPANY** being absent |
| Mileage: $ _____ | from the domicile at time of said service. |
| _____ / ENTERED /_____ | Returned the same day |
| PAPER        RETURN | _____ No. _____ |
| _____/_____/_____ | Deputy Sheriff of _____ |
| SERIAL NO.    DEPUTY    PARISH | |

# CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

## STATE OF LOUISIANA

NUMBER 2019 - 08672                           DIVISION "___"   **SECTION 7**

### FUTS AUTO BODY REPAIR, LLC

**VERSUS**

### SCOTTSDALE INSURANCE COMPANY and NATIONWIDE INSURANCE COMPANY

**FILED:**_____         **DEPUTY CLERK:**_____

### PETITION FOR DAMAGES, BREACH OF DUTY and CONTRACT

NOW INTO COURT, through undersigned counsel, comes Futs Auto Body Repair,

LLC ("Petitioner"), a Limited Liability Company formed under the laws of the State of

Louisiana, domiciled in the Parish of Orleans, State of Louisiana who with respect avers as

follows:

1.

Made Defendant herein, Scottsdale Insurance Company ("Scottsdale"), is a foreign

insurance company authorized to do and presently doing business in the State of Louisiana,

who at all times relevant who at all times relevant herein underwrote the coverage extended

Petitioner under a certain Commercial insurance policy bearing Policy Number CPS3082158.

2.

Made Defendant herein, Nationwide Insurance Company ("Nationwide"), is a foreign

insurance company authorized to do and presently doing business in the State of Louisiana, who

at all times relevant herein owned Scottsdale, the insurer extending coverage to Petitioner under

a Commercial Property insurance policy bearing Policy Number CPS3082158 ("Commercial

Policy").

3.

Venue is proper in this Parish and State as Petitioner is domiciled in this Parish, the loss

alleged herein covered under the Commercial Policy occurred in this Parish. La. CCP Art. 76.

4.

On August 18, 2018, Petitioner's Commercial Policy remained in full force and effect.

5.

On Saturday August 18, 2018, a portion of the roof covering the premises described in

the Declarations Page, 2135 S. Derbigny Street, New Orleans Louisiana, collapsed.



1

6.

Petitioner's Agent promptly reported the partial roof collapse to Scottsdale via Property Loss Notice dated August 20, 2018. (Exhibit A.)

7.

Pursuant to the terms of its Commercial Policy, Scottsdale agreed to "pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations Page caused by or resulting from any Covered Cause of Loss."

8.

Based on the terms of the policy, a Covered Cause of Loss includes losses or damage occasioned by those causes set out in "Causes of Loss -Broad Form" attached to and made part of the policy.

9.

The partial roof collapse at the premises described in the Declarations Page constitutes "direct physical loss of or damage to" property covered under the Commercial Policy.

10.

Because the roof collapse constitutes "direct physical loss of or damage to" property covered under the policy, coverage is afforded under the Scottsdale policy unless resulting from a cause not identified in and/or excluded under the  "Causes of Loss -Broad Form" attached to and made part of the policy.

11.

Scottsdale sent an adjuster to inspect the partially collapsed roof. The inspector reported the portion of the roof that collapsed had indications of deterioration to the roof surface, rust on the metal roof trusses and in roofing material.

12.

Thereafter, Scottsdale or Nationwide retained Mr. Evan Marshall, P.E., a consulting engineer with Envista Forensics (Envista), to inspect the building and partially collapsed roof.

13.

Envista conducted its inspection on August 23, 2018; Envista reported its findings and conclusions by report dated September 18, 2018.

14.

Envista's Report states:

*The building was a one-story, steel and concrete block-framed structure supported by a concrete foundation. Exterior walls were clad with painted concrete block. The roof near the front of the building was covered with aggregate-surfaced asphalt BUR on metal deck, which was supported by steel bar joists. . .*

*The bar joists at the front of the building spanned north-to-south, between the front concrete masonry unit (CMU, or concrete block) wall and an intermediate (interior) steel beam support. Envista observed that 10 bar joists (and the supported roofing) at the front-middle of the building were partially collapsed - the south (front) ends of the joists were on the ground and the north ends were still supported in the air by a steel beam. Envista also observed that the front concrete block wall at this location was free standing the lateral support/restraint provided by the fallen roof joists was then missing.*

*Close inspection of the fallen roof joists revealed extensive corrosion/deterioration to the (south) ends (bearing seats) of the joists. Similar corrosion was observed at the south ends of the roof joists along the front of the building that had not fallen, as well as to the embedded steel bearing plates to which the fallen joists were attached. **The observed corrosion [to the bearing seats of the joists] was consistent with long-term deterioration due to exposure to high humidity and/or liquid water. The corrosion was sufficiently advanced that significant portions of the steel were missing, and the remaining portions of steel were weakened. Envista also observed that portions of the ends of the fallen joists were bent and fractured. This was consistent with the weakened steel failing under [the] weight [of the roof].***

<u>*Based on the aforementioned observations and pertinent information, Envista concluded that the reported roof collapse was caused by the effects of gravity on the long-term and extensive corrosion to the steel roof joists.*</u>

### Petitioner's claim for collapse caused by decay

15.

Scottsdale, allegedly based on Envista's Report, denied coverage for a partial collapse of the roof at Petitioner's premises by letter dated November 27, 2018 ("Denial Letter").

16.

Scottsdale's Denial Letter stated the Commercial Policy only provides coverage for damage caused by one of the covered causes of loss listed in the policy. The Denial Letter referred Petitioner to policy form CP 00 10 (10-12) which in relevant part provides "Covered causes of loss means: . . . 14 a. Water Damage, meaning accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance, that is located on the described premises and contains water or steam. However, Water Damage does not include: (1) Discharge or leakage from: (c) Roof drains, gutters, downspouts or similar fixtures or equipment; (3) Loss or damage caused by or resulting from continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more; . . . "

3

17.

Referencing the Water Damage coverage part, Scottsdale's Denial Letter stated damage caused by or resulting from continuous or repeated seepage or leakage of water was/is excluded under the policy.

18.

Scottsdale's Denial Letter also claimed wear and tear, deterioration, rust, corrosion are not listed as covered causes of loss under the policy and thus not covered under the policy.

19.

The Denial Letter went on to state the Policy does not provide coverage for collapse of a structure unless the collapse qualifies as a Covered Cause of Loss under the Additional Coverage - Collapse provisions of the Commercial Policy.

20.

Under C. Additional Coverage - Collapse provisions of the Commercial Policy:

The coverage provided under this Additional Coverage, Collapse, applies only to an abrupt collapse as described and limited in C.1. through C.7.

1. For the purpose of this Additional Coverage, Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

21.

For the purpose of this Additional Coverage, collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

22.

Envista's Report states "[d]ue to the partially collapsed condition of the roof and the un-restrained front wall, Envista advised the owners to keep people away from the front wall and partially collapsed portion of the roof."

23.

The abrupt falling of a portion of the roof covering the front portion of the building housing Petitioner's auto shop rendered that portion of the building unusable and satisfies the Commercial Policy's definition of a "collapse."

24.

The "Additional Coverage" Collapse provision provides"[w]e will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a

4

building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:. . . b. **Building decay that is hidden from view, unless the presence of such decay    is   known   to an insured prior to collapse; . . .**

25.

Scottsdale has not advanced any particular meaning of the term "decay; the term "decay" is not defined in the Policy. Because decay is undefined, the courts generally turn to dictionary definitions to ascertain its ordinary meaning.

26.

The Merriam-Webster Dictionary's pertinent definitions of "decay" include: "1: gradual decline in strength, soundness, or prosperity or in degree of excellence or perfection... 2: a wasting or wearing away: ruin ... [and] 4 a: rot ... specifically: aerobic decomposition of proteins chiefly by bacteria...." Decay Definition, https://www. merriam-webster.com/dictionary/decay (last visited May 9, 2018). Similarly, the Oxford English Dictionary defines "decay" as: "1. a. The process of falling off from a prosperous or thriving condition; progressive decline.... 3. a. Of material things: Wasting or wearing away, disintegration; dilapidation, ruinous condition.... 5. The destructive decomposition or wasting of organic tissue; rotting." Decay Definition, www.oed.com/view/Entry/48067?rskey=z7 ljDr&result=1#eid (last visited May 9, 2018).

27

The only reasonable implication is that the plain and ordinary meaning of "decay" as used in the Commercial Policy encompasses decay in the broader sense of a gradual deterioration or decline in strength or soundness. *Joy Tabernacle-The New Testament Church v. State Farm Fire & Cas. Co.*, 616 Fed.Appx. 802, 808-09 (6th Cir. 2015) (declining to adopt a narrow definition of "decay" as organic rot and instead applying a broader definition that includes "a general decline or degeneration over time"); *Ne. Center Inc. v. St. Paul Fire & Marine Ins. Co.*, No. 1:03-CV-246TS, 2006 WL 842396, at *5 (N. D. Ind. Mar. 28, 2006) (concluding that "decay" "is not ordinarily understood to mean only 'rot,'" but rather, connotes "a progressive failure in strength and soundness" or "wasting and wearing away").

28.

To the extent that the term "decay" could be considered ambiguous, any ambiguity would be construed in favor of Futs Auto as the insured. *Clark Sch. for Creative Learning*, 734 F.3d at

5

55. This would also result in the broader construction of the term "decay." *See Stamm Theatres, Inc. v. Hartford Cas. Ins. Co.,* 93 Cal.App.4th 531, 113 Cal.Rptr.2d 300, 302 (2001) (finding "decay" to be ambiguous and construing it in favor of coverage, such that coverage for collapse due to "hidden decay," without express limitation of that term to organic decomposition, included collapse caused by a "concealed process of gradual loss in the strength of building materials").

29.

In denying Petitioner's claim for collapse based on decay, Scottsdale maintained "the rust, corrosion, and deterioration of the roof that the engineer found caused the roof to collapse were not hidden from view as reflected in the photographs in the engineer's report and as reflected by the previous repairs to the deteriorated and rusted roof components. Therefore, the collapse was not caused by decay hidden from view."

30.

Denying Petitioner's claim for collapse based on decay, Scottsdale necessarily maintained the term "decay" as used in the Policy is synonymous with the "corrosion" the Engineer is alleged to have observed upon close examination of the fallen roof and supporting joists.

31.

Corrosion, which can be simply defined as rust, is a natural phenomenon; a chemical process rooted in science. As the metal is exposed to exposed to these factors, the corrosion process begins, oxides are formed on the steel surface. The performance of atmospherically exposed metals depends on five main factors: temperature, humidity, rainfall, sulfur dioxide (pollution) concentration in the air, and air salinity. Neither of the factors however can be singled out as the main contributor to corrosion.

32.

Merriam Webster's Collegiate Dictionary (10th ed.1996) provides the following definitions for "corrode" and "decay":

Corrode: 1: to eat away by degrees as if by gnawing; esp: to wear away gradually usu. by chemical action (the metal was *corroded* beyond repair); 2: to weaken or destroy gradually: undermine.

Decay: 1: to decline from a sound or prosperous condition; 2: to decrease gradually in quantity, activity, or force; 3: to fall into ruin; 4: to decline in health, strength, or vigor; 5: to undergo decomposition.

33.

Webster's Dictionary lists "decompose," "rot," "putrefy," and "spoil" as synonyms of "decay," but it does not include "corrode" as a synonym of "decay."

34.

As nouns the difference between **decay** and **corrosion** is that **decay** is the process or result of being gradually decomposed while **corrosion,** is the act of corroding or the condition so produced, **i.e., rust.**

35.

Scottsdale maintains the Engineer's observation of the condition produced by corrosion, rust, is synonymous with Petitioner's observation of decay, i.e., gradual deterioration or decline in strength or soundness of the bearing seats of the joists supporting the roof at the south end of the building, prior to the collapse of the roof.

36.

That the presence of rust is a naturally occurring phenomenon, the mere presence of rust to the bearing seats of the joists did not mean decay the Engineer opined contributed to the collapse, i.e., gradual loss in strength the steel bar joists supporting the roof at the south end of the building, at the front-middle of the building, was not hidden from view.

37.

That rust is a naturally occurring phenomenon, decay, i.e., gradual loss in strength the steel bar joists to the point of collapse, was indeed hidden from view.

38.

Petitioner is entitled to coverage extending under the "Additional Coverage" provision of the Commercial Policy for a collapse caused by decay.

39.

Scottsdale possessed the right, pursuant to the Inspections And Surveys provisions of the Commercial Policy, to perform an inspection of the property to determine insurability of the property, premiums to be charged; the right to give the insured reports on the conditions of the property it found and/or recommend changes based on the conditions it found.

40.

Prior to issuing the Commercial Policy, Scottsdale retained an independent vendor to conduct such an inspection of Petitioner's premises in accordance with provisions of the policy.

41.

That Scottsdale used the inspection to determine insurability of the property and the rate of premium charged, Scottsdale bore a duty upon conducting the inspection to provide Petitioner with a report of any conditions found affecting insurability of the property and/or recommend changes based on the conditions found affecting insurability of the property.

42.

Post inspection of the premises, Scottsdale failed to provide Petitioner with a report of any conditions found affecting insurability of the property nor did it recommend changes based on the conditions found affecting insurability of the property.

43.

Scottsdale maintains the Engineer's inspection of the fallen roof joists revealed extensive corrosion/deterioration to the (south) ends (bearing seats) of the joists; revealed similar corrosion was observed at the south ends of the roof joists along the front of the building that had not fallen, as well as to the embedded steel bearing plates to which the fallen joists were attached.

44.

To the extent Scottsdale interprets the "corrosion" observed by the Engineer as being synonymous with the term "decay" as used in the Policy and thus not hidden from view, upon initial inspection and observing the corrosion, Scottsdale bore a duty to inform Petitioner of conditions found affecting insurability of the property and/or recommend changes based on the conditions found affecting insurability of the property.

45.

To the extent Scottsdale interprets the "corrosion" observed by the Engineer as being synonymous with the term "decay" as used in the Policy and thus not hidden from view, Scottsdale's agent having observed the rust and corrosion first hand upon inspection of the premises, Scottsdale having failed to report conditions found affecting insurability of the property, failed to recommend changes based on its agent's observation of the conditions found affecting insurability of the property, Scottsdale misled Petitioner to think coverage continued under the Policy for collapse caused by decay when it did not.

46.

To the extent Scottsdale interprets the "corrosion" observed by the Engineer as being synonymous with the term "decay" as used in the Policy and thus not hidden from view,

8

Scottsdale's agent having observed the rust and corrosion first hand upon inspection of the premises, Scottsdale having failed to report conditions found affecting insurability of the property, failed to recommend changes based on its agent's observation of the conditions found affecting insurability of the property, the presence of decay was hidden from view and not known to the insured prior to collapse.

**Petitioner's claim for collapse caused by weight of rain that collects on a roof.**

47.

The Commercial Policy provides: "Additional Coverage" under the Policy provides"[w]e will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:. . : e. Weight of rain that collects on a roof.

48.

Envista's Report states:

> "Inspection of the attic space/mezzanine above the front office (at the west end of the building) revealed widespread moisture stains and corrosion on the underside of the metal roof decking and joists, with concentrated staining near and on the inside face of the front concrete block wall, and around roof penetrations. Envista observed widespread instances of apparently ad-hoc water diversion channels made from suspended metal and plastic panels, and basins/buckets. The channels ran from heavily stained and corroded roof locations towards, and into, the buckets. The buckets had stains (consistent with previously standing water) and/or standing water. (Attachment A - Photographs)."

> "Envista did not access/walk-on the built-up roofing surface. However, inspection of the roof from a stairway exposed to the roof revealed stains, material deposits, and plant growth, consistent with relatively flat roof surfaces that can allow rainwater to pond. Envista also observed deteriorated conditions to the roof surface. Deteriorated roofing membranes and seals can provide pathways for water through the roofing system. The observed stains on the underside of the roof deck were consistent with long-term and ongoing moisture intrusion through aged and deteriorated roofing."

> "Envista considered whether wind could have initiated or contributed to the collapse. Wind speeds in the vicinity of the property were reported to be 30 mph on the reported date of occurrence. This was significantly below the approximate design wind speed given in the building code of 130 mph. Additionally, Envista observed plant growth and trash/debris deposits on the roof that had not appeared to have been moved or dislodged. What is more likely than wind contributing to the roofs collapse is the ever-present force of gravity acting on the roof. It is Envista's opinion that the self-weight of the roof was sufficient to cause the deteriorated steel to fail. Once one roof joist failed, it would cause its load to transfer (at least in-part) to the next nearest joist, which could cause collapse to propagate to nearby joists, causing the roof system to fail. The partial roof collapse was consistent with one or more joists failing under the roofs weight and initiating the collapse."

> _Based on the aforementioned observations and pertinent information, Envista concluded that the reported roof collapse was caused by the effects of gravity on the long-term and extensive corrosion to the steel roof joists._

9

49.

Envista observed that 10 bar joists (and the supported roofing) at the south end of the building, at the front-middle of the building were partially collapsed - the south (front) ends of the joists were on the ground; observed the bar joists (and the supported roofing) at the north ends of the building were still supported in the air by a steel beam

50.

Envista's Report states the collapse resulted in damage to roughly 1000 square feet metal roof deck (and supported roofing) localized to the south end of the building, at the front-middle of the building.

51.

Envista considered whether wind could have initiated or contributed to the collapse. Upon observing plant growth and trash/debris deposits on the roof [indicative of ponding water] appeared not to have been moved or dislodged, that the Climate Date attached to its Report reflected wind speeds in the area recorded by the National Weather Service were significantly below the approximate design wind speed of 130 mph, Envista ruled out wind as a factor in initiating or contributing to the collapse.

52.

Envista's Report states an "[i]nspection of the roof from a stairway exposed to the roof revealed stains, material deposits, and plant growth, consistent with relatively flat roof surfaces that can allow rainwater to pond." Envista's Report states the Engineer observed deteriorated conditions to the roof surface; states deteriorated roofing membranes and seals can provide pathways for water through the roofing system.

53

Envista's Report establishes the Engineer observed factors evidencing ponding water on the roof. Ponding water is defined as the water which remains on a roof 48 hours or longer. When water stands for long periods of time, algae and vegetation growth will likely occur, and may cause damage to the roof membrane.

54.

Ponding water on a flat roof increases a roof's live load in a relatively concentrated area. Envista's Report evidences a partial collapse of the roof localized to 10 bar joists (and the supported roofing) at the south end of the building, at the front-middle of the building; evidences

a partial collapse resulting in damage to roughly 1000 square feet metal roof deck (and supported roofing) localized to the south end of the building, at the front-middle of the building.

55.

Envista knew as water accumulates, deck deflections can increase, thereby resulting in additional ponding water which could compromise the structural integrity of the deck; knew as ponding water gains depth and weight, it causes deflection in an area, which means an even greater water thickness will result; knew this progressive deflection can continue to expand until the ultimate bearing capacity is reached and potentially end in collapse.

56.

A 20 ft x 20 ft (6.1 m x 6.1 m) roof area with **1 in.** (25.5 mm) of water could add over a ton (908 kg) of additional roof loading. Based on the Climate Date attached to its Report, Envista knew the National Weather Service reported rainfall totals in New Orleans of 0.89" on 8/17/18, of 0.91" on 8/18/18; Envista knew a total of **1.8 inches** of rainfall over that 48 hour period.

57.

The National Weather Service announced on August 19, 2018 that the flash flood watch covering Orleans, St. Charles, St. John The Baptist, upper Jefferson, upper Plaquemines, and upper St. Bernard parishes in effect on Saturday August 18, 2018 remained in effect in the New Orleans area south of Lake Pontchartrain Sunday (Aug. 19), **a day after a stormy Saturday caused street flooding in areas including Mid-City.** National Weather Service forecasters warned that locally heavy rainfall was possible again Sunday, and storms could have gusty winds and frequent lightning. **The main concern, forecasters said, was the possibility for storms that "train," or don't move through quickly.**

58.

Envista opined *"the ever-present force of gravity acting on the roof contributed to its collapse;"* opined the *"*self-weight of the roof was sufficient to cause the deteriorated steel to fail;" opined *"the partial roof collapse was consistent with one or more joists failing under the roofs weight and initiating the collapse;"* "concluded the roof collapse was caused by *the effects of gravity on the long-term and extensive corrosion to the steel roof joists."*

59.

Envista knew the ***downward force of gravity*** acting on the roof at the south end, front-middle portion of the building was equivalent to ***weigh of the roof*** at the south end, front-middle portion of the building.

60.

Envista knew the "weight of rain that [quite possibly] collect[ed] on the roof" at the south end, front-middle portion of the building would have increased the force of gravity acting on that portion of the roof causing one or more joists to fail under the roofs weight initiating the partial collapse.

61.

Scottsdale retained Envista to determine the cause(s) for the partial roof collapse. Presumably, Scottsdale was to base its determination as to whether the collapse was as result of any of the covered cause of loss under the additional coverage for collapse on Envista's Report.

62.

Scottsdale's Denial Letter states "[t]he engineer confirmed that neither wind nor the weight of rain were factors in causing the roof collapse; the engineer's investigation establishes that the collapse was not the result of any of the covered cause of loss under the additional coverage for collapse; the engineer confirmed that weight of rain was not a factor in the roof collapse; the engineer did not attribute the collapse to one of the covered causes of loss listed under the collapse coverage.

63.

Envista's Report fails to contain any statement indicating whether the Engineer even considered whether the weight of rain was a factor contributing or causing the roof collapse. So not to divulge information within Envista's purview establishing Petitioner's entitlement to coverage thorough its Report, Scottsdale directed Envista not to make no reference in its Report as to whether the weight of rain could have initiated or contributed to the partial collapse of the roof.

64.

Envista's Report fails to contain an affirmative statement confirming its opinion the weight of rain was not a factor in the roof collapse. Envista's Report supports a finding the "weight of rain that collects on a roof" contributed to its collapse.

65.

Disavowing the fact Envista's Report fails contain an opinion declaring the weight of rain was not a factor in the partial collapse of the roof, Scottsdale offered materially untrue statements concerning the scope of Envista's Report and conclusions reached therein in support of its denial so not to divulge information known to Envista establishing Petitioner's entitlement to coverage under the Policy.

66.

Irrespective as to whether the decay the Engineer maintains contributed to the collapse was hidden from view and/or covered under the Commercial Policy, the Additional Coverage - Collapse provisions extends coverage if such collapse is caused by one or more causes covered there under.

67.

When considering additional insurance, like the collapse coverage at issue here, courts have refused to apply either anti-concurrent causation provisions or efficient proximate cause analysis because "general exclusions listed in the Policy do not modify or qualify the additional collapse coverage." *State Auto. Mut. Ins. Co. v. R.H.L., Inc.,* No. 07-1197, 2010 WL 909073, at *12 (W.D. Tenn. Mar. 12, 2010); *see also Young Sook Pak v. Alea London Ltd.,* Civ. No. 1:08-CV-0824, 2009 WL 2366549, at *7 (M.D. Penn. July 30, 2009). *Certain Underwriters at Lloyd's v. KKM INC.,* 215 S.W.3d 486 (Tex. App. 2006).

68.

Petitioner is entitled to coverage extending under the "Additional Coverage" provision of the Policy for a collapse caused by the "weight of rain that collects on a roof."

**Scottsdale's Untrue Statements/Failure to Divulge Pertinent Facts**

69.

LSA R.S. 22:1973. Good faith duty; claims settlement practices; cause of action penalties provides:

A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.

70.

Subsection B(1) imposes liability under the statue on an insurer for "[m]isrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue." LA. REV. STAT. § 22:1973(B)(1).

71.

"Misrepresentation can occur when an insurer either makes untrue statements to an insured concerning pertinent facts or fails to divulge pertinent facts to the insured." McGee v. Omni Ins. Co., 840 So.2d 1248, 1256 (La. Ct. App. 2003).

72.

Mr. Evan Marshall, P.E. with Envista Forensics (Envista) performed an inspection of the insured premises on August 28, 2018. Envista issued its report signed by Jason Johnston, P.E., MLSE, Senior Project Engineer on September 18, 2018.

73.

Scottsdale retained Envista to determine the cause(s) for the partial roof collapse; Presumably, Scottsdale was to base its determination as to whether the collapse was as result of any of the covered cause of loss under the additional coverage for collapse on Envista's Report.

74.

Scottsdale's denial letter claimed "[t]he engineer confirmed that neither wind nor the weight of rain were factors in causing the roof collapse; the engineer's investigation establishes that the collapse was not the result of any of the covered cause of loss under the additional coverage for collapse; the engineer confirmed that weight of rain was not a factor in the roof collapse; the engineer did not attribute the collapse to one of the covered causes of loss listed under the collapse coverage."

75.

Envista's Report establishes the Engineer observed factors evidencing ponding water on the roof. Ponding water is defined as the water which remains on a roof 48 hours or longer. Envista knew as water accumulates, deck deflections can increase, thereby resulting in additional ponding water which could compromise the structural integrity of the deck; knew as ponding water gains depth and weight, it causes deflection in an area, which means an even greater water thickness will result; knew this progressive deflection can continue to expand until the ultimate bearing capacity is reached and potentially end in collapse.

76.

Envista knew ponding water on a flat roof can increase a roof's live load in a relatively concentrated area. Envista's Report evidences a partial collapse of the roof localized to 10 bar joists (and the supported roofing) at the south end of the building, at the front-middle of the building; evidences a partial collapse resulting in damage to roughly 1000 square feet metal roof deck (and supported roofing) localized to the south end of the building, at the front-middle of the building.

77.

A 20 ft x 20 ft (6.1 m x 6.1 m) roof area with **1 in.** (25.5 mm) of water could add over a ton (908 kg) of additional roof loading. Envista knew from the Climate Date attached to its Report that the National Weather Service reported rainfall totals in New Orleans of 0.89" on 8/17/18, of 0.91" on 8/18/18. Envista knew a total of **1.8 inches** of rainfall over that 48 hour period.

78.

Envista opined "*the ever-present force of gravity acting on the roof contributed to its collapse;*" opined the "self-weight of the roof was sufficient to cause the deteriorated steel to fail;" opined "*the partial roof collapse was consistent with one or more joists failing under the roofs weight and initiating the collapse;*" "concluded the roof collapse was caused by *the effects of gravity on the long-term and extensive corrosion to the steel roof joists.*"

79.

Envista knew the *downward force of gravity* acting on the roof at the south end, front-middle portion of the building would have been equivalent to *weigh of the roof* at the south end, front-middle portion of the building.

80.

Based on information within its purview, Envista knew the "weight of rain [that could have] collect[ed] on the roof" at the south end, front-middle portion of the building would have increased the force of gravity acting on that portion of the roof causing one or more joists to fail under the roofs weight initiating the partial collapse.

81.

Scottsdale knew the Additional Coverage - Collapse provision extends coverage if such collapse is caused by one or more causes covered there under; knew, irrespective as to whether

the decay the Engineer opined contributed to the collapse was hidden from view or not, coverage could independently extend to a collapse caused by the "weight of rain that collects on a roof."

82.

Envista's Report affirmatively states the Engineer considered whether wind could have initiated or contributed to the collapse, affirmatively states the Engineer ruled out wind as a factor in initiating or contributing to the collapse.

83.

Though Envista's Report clearly establishes the Engineer observed factors evidencing ponding water on the roof, Envista knew ponding water on a flat roof can increase a roof's live load of the roof in a relatively concentrated area, Envista's Report evidences a partial collapse of the roof localized to 10 bar joists (and the supported roofing) at the south end of the building, at the front-middle of the building, Climate Date attached to Envista's Report evidences Envista knew a total of **1.8 inches** of rain fell in 48 hours between 8/17/18 and 8/18/18, the date of the collapse, Envista's Report fails however to contain any statement indicating the Engineer considered whether the weight of rain was a factor contributing or causing the roof collapse, fails to contain an affirmative statement confirming their opinion the weight of rain that collects on the roof was not a factor in causing the partial collapse.

84.

The only plausible explanation for Envista's actions is Scottsdale directed Envista not to make reference to any consideration given to whether the weight of rain could have initiated or contributed to the partial collapse of the roof so not to disclose information within Envista's purview tending to establish Petitioner's entitlement to coverage under the "weight of rain that collects on the roof" coverage part.

85.

Engineers who write these types of reports for insurance companies to use to deny claims that contain **incorrect, partial, or biased information** may well be forced to justify their actions (if they can) to their respective licensing boards that monitor and enforce competency and impartiality.

86.

Disavowing the fact Envista's Report fails to contain any statement indicating the Engineer considered whether the weight of rain was a factor contributing or causing the roof

collapse; fails to contain an affirmative statement confirming their opinion the weight of rain that collects on the roof was not a factor in causing the partial collapse, Scottsdale claimed "[t]he **engineer confirmed . . . that the weight of rain [was not a] factor[] in causing the roof collapse; the engineer's investigation establishes that the collapse was not the result of any of the covered cause of loss under the additional coverage for collapse; the engineer confirmed that weight of rain was not a factor in the roof collapse;** the engineer did not attribute the collapse to one of the covered causes of loss listed under the collapse coverage."

87.

Scottsdale breached its a duty of good faith and fair dealing owed Petitioner, breached its affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured by intentionally misrepresenting facts contained in and the conclusions reached in Envista's Report, by directing Envista not to make reference to any consideration given to whether the weight of rain could have initiated or contributed to the partial collapse of the roof, directing Envista not to disclose information within Envista's purview tending to establish Petitioner's entitlement to coverage under the "weight of rain that collects on the roof" coverage part, denying coverage to which Scottsdale knew Petitioner was entitled under the Policy.

88.

Petitioner suffered general and/or special damages as result of Scottsdale's breach of duty owed; is entitled an award of general and/or special damages as result of Scottsdale's breach of duty owed; entitled to be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.

WHEREFORE, Petitioner, Futs Auto Body Repair, LLC, prays defendants Scottsdale Insurance Company and Nationwide Insurance Company be duly served and cited to appear and answer this Petition, and after due proceedings had, there be judgment rendered in favor of Petitioner Futs Auto Body Repair, LLC and against Nationwide Insurance Company and Scottsdale Insurance Company, jointly, severally and in solido,

a. Declaring Futs Auto Body Repair, LLC entitled to coverage under the Commercial Policy of insurance issued by Scottsdale bearing Policy Number CPS3082158 for those damages suffered as a result of a roof collapse on August 18, 2018;

collapse; fails to contain an affirmative statement confirming their opinion the weight of rain that collects on the roof was not a factor in causing the partial collapse, Scottsdale claimed "[t]he **engineer confirmed . . . that the weight of rain [was not a] factor[] in causing the roof collapse; the engineer's investigation establishes that the collapse was not the result of any of the covered cause of loss under the additional coverage for collapse; the engineer confirmed that weight of rain was not a factor in the roof collapse;** the engineer did not attribute the collapse to one of the covered causes of loss listed under the collapse coverage."

87.

Scottsdale breached its a duty of good faith and fair dealing owed Petitioner, breached its affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured by intentionally misrepresenting facts contained in and the conclusions reached in Envista's Report, by directing Envista not to make reference to any consideration given to whether the weight of rain could have initiated or contributed to the partial collapse of the roof, directing Envista not to disclose information within Envista's purview tending to establish Petitioner's entitlement to coverage under the "weight of rain that collects on the roof" coverage part, denying coverage to which Scottsdale knew Petitioner was entitled under the Policy.

88.

Petitioner suffered general and/or special damages as result of Scottsdale's breach of duty owed; is entitled an award of general and/or special damages as result of Scottsdale's breach of duty owed; entitled to be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.

WHEREFORE, Petitioner, Futs Auto Body Repair, LLC, prays defendants Scottsdale Insurance Company and Nationwide Insurance Company be duly served and cited to appear and answer this Petition, and after due proceedings had, there be judgment rendered in favor of Petitioner Futs Auto Body Repair, LLC and against Nationwide Insurance Company and Scottsdale Insurance Company, jointly, severally and in solido,

a. Declaring Futs Auto Body Repair, LLC entitled to coverage under the Commercial Policy of insurance issued by Scottsdale bearing Policy Number CPS3082158 for those damages suffered as a result of a roof collapse on August 18, 2018;

17

b. Ordering Nationwide Insurance Company and Scottsdale Insurance Company to pay the property damages sustained by the Futs Auto Body Repair, LLC a result of the roof collapse on August 18, 2018;

c. Ordering Nationwide Insurance Company and Scottsdale Insurance Company pay Futs Auto Body Repair, LLC general and specific damages sustained as result of Scottsdale's breach of duty owed; pay Futs Auto Body Repair, LLC penalties in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater for its breach of duty owed Petitioner;

d. together with legal interest thereon from the date of judicial demand, for all costs of these proceedings, and for all general and equitable relief.

RESPECTFULLY SUBMITTED:

JEROME J. PELLERIN, ESQ. (17739)
9624 Belfast Street
NEW ORLEANS, LOUISIANA 70118
Attorney for Futs Auto Body, LLC
(504) 261.5839 (Office)/504.322.3285(Fax)

**PLEASE SERVE:**

Scottsdale Insurance Company thru
Secretary of State for the State of Louisiana
8535 Archives Avenue
P.O. Box 94125
Baton Rouge, Louisiana 70809

Nationwide Insurance Company thru
Secretary of State for the State of Louisiana
8535 Archives Avenue
P.O. Box 94125
Baton Rouge, Louisiana 70809

A TRUE COPY

DEPUTY CLERK CIVIL DISTRICT COURT
PARISH OF ORLEANS
STATE OF LA

18

**R. KYLE ARDOIN**
**SECRETARY OF STATE**
**P.O. BOX 94125**
**BATON ROUGE, LA 70804-9125**



7019 1120 0000 2373 2079

Baton Rouge P&DC 709
THU 16 JAN 2020 PM

U.S POSTAGE >> PITNEY BOWES

ZIP 70802
02 4M
0000367315

$ 005.25°
JAN 16 2020

SS151-A